**McKinley LETSINGER, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 12364.**

District of Columbia Court of Appeals.

Argued April 6, 1979.

Decided May 22, 1979.

Rehearing Denied June 26, 1979.

---

2. This should be based upon the needs and ability to pay prevailing at the time of the remand proceedings.

Dennis M. O'Keefe, Chicago, Ill., appointed by this court, for appellant.

John H. Sturc, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter E. George and Joseph B. Valder, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before KELLY, KERN and GALLAGHER, Associate Judges.

KERN, Associate Judge:

A jury convicted appellant of second-degree murder while armed, second-degree murder, armed robbery, robbery, and assault with a deadly weapon.[1] After vacating the lesser-included offenses, the trial court sentenced appellant to five to fifteen years for armed robbery and fifteen to forty-five years for second-degree murder, to be served concurrently. On appeal appellant charges that several errors committed by the court and prosecuting attorney require reversal. We find none of the asserted errors to be of a nature requiring reversal and therefore affirm.

I

On the morning of June 14, 1976, Glendora Sturdevant, also known as Sweetie, was found dead in her apartment, the victim of multiple stab wounds and manual strangulation. The evidence at trial developed the following sequence of events from which the jury determined appellant's guilt.

In the early morning hours of Saturday, June 12, 1976, appellant, Sweetie and others devised and successfully executed a plan to rob David Smith in his apartment. With the proceeds, some money and Smith's watch, appellant and another purchased heroin which the group divided and then used in Sweetie's apartment. Both before and after consumption of the heroin Sweetie and appellant engaged in violent arguments, at one point each needing to be physically restrained by the others in the group.

Meanwhile Smith, the robbery victim, having recognized his assailants, reported the incident to the police. He also called the stepmother of one of the women he thought was involved.

Later that day, the group met at Sweetie's apartment to decide on a course of action since Smith knew their identities. Sweetie's brother told them that based on his own discussion with the victim, Smith might drop charges if his money and watch were returned. Sweetie became extremely upset, promising to "bust on everybody," particularly on appellant, if she got in trouble. Appellant made an attempt to retrieve Smith's money with which the narcotics had been purchased, but returned to the apartment with only the empty wallet and Smith's watch. Another argument ensued during which appellant stepped into the hall and refused to re-enter the apartment for fear of hurting Sweetie. Later that evening, appellant phoned his cousin, telling her he was going to "kick" Sweetie's "butt."

About 12:30 a. m. on Monday, June 14, a tenant in Sweetie's apartment building, a Mr. Ward, entered the elevator with a man wearing a green shirt with gold trim and green pants.[2] Ward saw the man get off the elevator at the sixth floor and turn left toward Sweetie's apartment. A little after 2 a. m. Ward, while outside the apartment building, heard a rattling noise coming from the direction of the victim's apartment.

The body was found at 8 a. m. that day and the police were summoned. Beneath the victim's fingernails they found green fuzz which was determined to be from a garment of some sort. That afternoon, Ward identified appellant's photo from an array of eight photographs as the man in the green shirt and pants whom he had seen approach Sweetie's apartment.[3] At a lineup held on June 29, the witness Ward did *not* identify appellant, who was in this lineup, but immediately afterward explained to the police that his failure was due to fear and he correctly related to them appellant's position in the lineup. The next day, before

1. D.C.Code 1973, §§ 22–2403, –2901, –3202, –502.

2. Appellant wore a green shirt with gold trim and green pants immediately after the robbery and at the meeting of the group the next day.

3. This witness testified he found appellant's lips and eyes particularly distinctive.

a grand jury, he identified appellant's picture.

On the day after Sweetie's death, the police searched appellant's apartment pursuant to a warrant. They found a pair of boxer shorts with small stains which were identified at trial as being human blood. Appellant turned himself in to the police on June 22, but denied even knowing the murder victim or owning a green shirt and green pants.

## II

Appellant first contends that the court committed reversible error in admitting into evidence before the jury the "mug shot" (showing appellant's face from both the front and side) from which the witness Ward made his initial identification of appellant immediately after the murder. Such a photograph, argues appellant, is by its very nature impermissible because it implies to the jury appellant's bad character by revealing his prior police record.

■ The introduction of mug shots into evidence does pose a danger to the defendant's rights by their potential for implying a prior criminal record.

It is well-settled law that the criminal record of a defendant may not be introduced into evidence at trial unless the defendant takes the stand or otherwise places his character in issue. A photograph which on its face reveals the existence of such a criminal record is likewise inadmissible when the defendant's character has not been placed in issue. [*Barnes v. United States*, 124 U.S.App. D.C. 318, 319, 365 F.2d 509, 510 (1966) (footnote omitted).]

On the other hand, such photographs may be useful to the prosecution in establishing, as was the case here, a previous identification. *United States v. Harrington*, 490 F.2d 487, 491 (2d Cir. 1973).

■ In recognition of the competing interests involved in the admission of mug shots, this court has rejected a rule denying their admissibility outright, but instead has adopted rigid criteria for their admissibility. *Williams v. United States*, D.C.App., 382 A.2d 1 (1978); *see also United States v. Harrington, supra*. The admission of such photographs will not be reversible error if: (1) the government has a demonstrable need to introduce the photographs; (2) the photographs in and of themselves do not imply a prior criminal record; and (3) the manner of their introduction does not draw attention to their source (that is, police records). *Williams v. United States, supra* at 5.

■ The government in the instant case had a legitimate purpose in introducing the mug shot. Identification of the appellant was a key issue, unlike the situation in *Williams*, and therefore it was important to show the jury some details of Ward's identification of appellant immediately after the events at issue. This identification assumed even more importance in light of the testimony concerning Ward's initial failure to identify appellant during the lineup.

The mug shot of appellant introduced at trial was of the standard type: two close-up facial shots, one side view and one front view. In *Williams, Harrington,* and *Barnes,* police information beneath the mug shots was masked in an incomplete manner, thus necessarily drawing to the attention of the jury the fact that certain information on the photographs was being withheld from them.[4]

Here, the prosecutor cropped the bottom portion of the mug shot which contained the potentially prejudicial information; hence, the jury in the instant case could draw no adverse inferences as was possible in the cases cited above. Appellant points to the notations on the back of this photo-

4. The rudimentary tape cover placed over the prison numbers on the photograph, and over the notations on the reverse side, neither disguised the nature of the picture nor avoided the prejudice. If anything, by emphasizing that something was being hidden, the steps taken here to disguise the nature of the picture may well have heightened the importance of the picture and the prejudice in the minds of the jury. [*Barnes v. United States, supra* at 320, 365 F.2d at 511.]

graph, including appellant's birthdate, another date, and an unidentified number, but they were handwritten, randomly placed and could have little meaning to a juror or anyone else who saw them. While we recognize that just the nature of the mug shot with its front and side views could be prejudicial, we do not deem the appearance of the photo put in evidence in this case so prejudicial as to require reversal. *United States v. De Sena*, 490 F.2d 692 (2d Cir. 1973) (opinion rendered on same day as *Harrington, supra*, by Waterman, J., who authored *Harrington*).

Finally, there was no testimony regarding the source of the mug shot from which the jury could have inferred appellant had a prior record. Therefore, in this case the admission of the mug shot in question complies with the criteria of *Williams*, and we conclude that the trial court properly admitted it into evidence.

### III

During the prosecution's presentation of its case in chief, the trial court curtailed the cross-examination of two government witnesses. In one instance, defense counsel attempted to probe into the relationship of the witness Smith with the decedent in order to establish a motive for him to kill her because she had betrayed him by her participation in the robbery. In the other instance, counsel questioned Betty Reid, one of the robbery participants, about Sweetie's former boyfriend to whom Sweetie had given a key to her apartment and to whom she may have owed money.

Appellant argues that the court denied him his right to cross-examination by its rulings. However, we are persuaded that the trial court's ruling is correct.

■■ The principal purpose of cross-examination is to probe the credibility of the witness and the truthfulness of his testimony, *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), not to present one's own case. *Waller v. United States*, D.C.App., 389 A.2d 801 (1978); *Smith v. United States*, D.C.App., 330 A.2d 519 (1974). In determining the proper scope of

cross-examination, the trial court must necessarily be vested with sufficient discretion both to keep cross-examination to its primary purpose and to maintain orderly, expeditious and relevant presentation of the evidence to the trier of fact. *Smith v. United States, supra; United States v. Stamp*, 147 U.S.App.D.C. 340, 458 F.2d 759 (1971), *cert. denied*, 406 U.S. 975, 92 S.Ct. 2424, 32 L.Ed.2d 675 (1972).

■ Our examination of the direct and cross-examination at issue reveals that the testimony that appellant's counsel sought to elicit on cross-examination was wholly extraneous to any matters revealed during the government's direct examination. None of the direct testimony of the two prosecution witnesses opened the door for the defense to attempt on cross-examination to attribute motive or opportunity to someone other than appellant. These matters were better left to appellant's case in chief. *Waller v. United States, supra.* Moreover, the trial court correctly recognized that much of what counsel sought to reveal was highly speculative and irrelevant. Therefore, we find no error in the trial court's ruling which limited appellant counsel's cross-examination in these two instances.

### IV

As part of his case, appellant's counsel attempted to call David Huff, one of those involved in the June 12 robbery of Smith, as an alibi witness concerning appellant's whereabouts at the time the murder took place. The court held a hearing out of the jury's presence on the issue of whether Huff would assert his Fifth Amendment privilege. Huff informed the court that he wished to testify about the events of June 13 and 14, but also wished to claim the privilege as to the events occurring on June 11 and 12. The government objected, claiming that if Huff testified about June 13 and 14, its cross-examination would necessarily probe into what took place on the earlier dates because the events at issue were so interrelated on these four consecu-

tive dates as to be practicably inseparable. Questions about Huff's association with appellant and questions of bias or general credibility would certainly reveal some of the incriminating events of June 11 and 12, as well as what occurred on June 13 and 14 about which he was willing to testify. The court agreed, ruling that the witness, if he waived his privilege for two of these days, would be obligated to waive it as to the whole set of related facts from June 11 (or earlier) to June 14.[5] Huff then, on advice of counsel, asserted his privilege as to all these days and refused to testify at all. Appellant contends that the court erred in denying appellant his Sixth Amendment right to present witnesses in his defense by requiring Huff to invoke or waive his privilege in its entirety concerning those particular days.

▮ The right which appellant feels the court violated is indisputably crucial to the conduct of a fair trial. *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, it is also well-settled law that where a defendant's Sixth Amendment right is in conflict with a witness' properly asserted Fifth Amendment right, the latter will prevail. *Alston v. United States*, D.C.App., 383 A.2d 307 (1978); *In re J. W. Y.*, D.C.App., 363 A.2d 674 (1976). Moreover, a witness cannot waive the privilege as to an incriminating fact and then assert it as to other related facts. *Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1950); 8 Wigmore, Evidence § 2276 (McNaughton rev. ed. 1961).

▮ We recognize that the Fifth Amendment privilege of a witness is narrower than that of a defendant, *Alston v. United States, supra; United States v.*

*Reese*, 183 U.S.App.D.C. 1, 561 F.2d 894 (1977), and that a witness may not assert a blanket privilege where a narrower privilege would suffice to protect his interests. *United States v. Reese, supra.* However, in this case we agree with the trial court that the events of June 11–14 were so intertwined as to make it impossible to fashion a narrower privilege. The facts of the murder which the government adduced flowed directly from the facts of the robbery of Smith only two days earlier.

Certainly it would be a hindrance to the search for truth, and unfair to the government if Huff were permitted to give alibi testimony on direct examination and the government denied its opportunity to explore fully his credibility. *Brown v. United States*, 356 U.S. 148, 156, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). Even the most limited cross-examination by the prosecution would necessarily have associated Huff with appellant and probed into possible bias in Huff's testimony.[6] These are matters that would obviously have led to questions concerning the events of June 11 and 12. The record is clear that had Huff been questioned about all of these dates the evidence would have been highly damaging to him at any subsequent trial.

We conclude therefore the court was correct in its ruling that the only way that Huff could permissibly assert his privilege in order to protect himself would be to claim it for all of the days in question.[7] *See United States v. Reese, supra; United States v. Caldwell, supra.*

## V

▮ Over the objection of appellant's counsel, the court admitted into evidence a

---

**5.** THE COURT: [Counsel], I know of no way in the world that the questioning of this witness could be limited on cross examination merely to the 13th and 14th of June if he is questioned in the first instance on direct examination with respect to just the 13th and 14th, because the evidence has . . . tended to indicate that this defendant does have relevant information with respect to incidents occurring on the days earlier than the 13th and 14th. And those events that occurred on the 13th and 14th are directly related and grow out of those events that occurred on the 11th and 12th. So those

two matters just cannot logically and consistently be separated one from the others. [Record at 489–90.]

**6.** Appellant could possibly have been a witness at Huff's subsequent trial.

**7.** In recognizing that the facts of June 11–14 constituted inseparable facts, the court was being consistent with its decision at the beginning of trial *not* to separate the trial of the robbery charge from the murder charges.

pair of undershorts found in the bathroom of appellant's apartment which he shared with his sister and another male. On them were small stains which expert testimony for the government established were human blood,[8] although the expert further testified there was too little blood to enable him to determine its type. The evidence connecting appellant to the shorts was quite tenuous, since another male occupied the living area where they were found and there was no evidence that appellant had worn the shorts on the night of the murder. Appellant urges that admission of this evidence, highly inflammatory by reason of the presence of blood, was reversible error. Here, we conclude that the court erred in admitting the shorts into evidence given their slight probative value and marked potential for prejudice. *United States v. Stabler*, 490 F.2d 345 (8th Cir. 1974); *see* Fed.R.Evid. 403. We deem this error harmless, however, because of the strength of the government's case, the relatively low visibility of the stains, and the fact the item was not stressed by the government.[9] *Hawkins v. United States*, D.C.App., 395 A.2d 45 (1978). *Cf. United States v. Stabler, supra* (blood-stained jacket was clearly the "most persuasive independent evidence linking the defendant with the crime").

## VI

The final claim of error revolves around an event occurring at the trial. While standing in the hallway during a break in the trial two jurors, one an alternate and the other a regular member, apparently overheard a threat by the victim's brother, *viz.*, he would "get them" and "kill them all," (presumably unless they returned a guilty verdict). The court conducted an extensive voir dire of these two jurors immediately upon being advised of this possi-

ble extra-judicial communication. This hearing revealed that the alternate juror had definitely overheard the statement but that the regular juror was unsure of exactly what she heard. Both stated unequivocally that what occurred would have no impact on their ability to render an impartial verdict. There was no indication that any other juror overheard the threatening remark.

Based on this voir dire, the court denied appellant's motion for a mistrial[10] but stated he might reconsider the matter before submitting the case to the jury. At that time, defense counsel renewed his mistrial motion. The government moved to excuse the regular jury member (the alternate did not participate in the deliberations). Appellant's counsel opposed that motion, however, citing the fact that this juror had been "fair enough to come forward" to reveal the fact of the comment. The court denied both motions. Now, on appeal, appellant claims that the court erred in denying his motion for a mistrial.

Extra-judicial communications to a juror are of course a serious matter. In criminal cases such communications immediately raise a presumption that they are prejudicial to the defendant and the government bears the burden of establishing the harmlessness of such contact. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *Waller v. United States, supra; United States v. Burke*, 496 F.2d 373 (5th Cir.), *cert. denied*, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974). Where that presumption is not rebutted, the court is bound to declare a mistrial, *Waller v. United States, supra*, but in recognition that the trial court is best equipped to evaluate such matters, appellate review is limited to an inquiry of

8. The two most noticeable stains measured in inches, 1/8 × 1/2 and 1/8 × 1/8.

9. We note that appellant's trial counsel did object to the admission of the undershorts on the ground of lack of relevancy, but he did not object to previous testimony describing them.

10. In making its ruling the court stated:

. . . I don't see any indication anyone else has overheard the conversation these two jurors have reported . . . .
I find little or no indication that there has been any substantial taint or any taint at all on the part of any members of the jury resulting from the particular comment that was made in the hallway.

whether the court abused its discretion in refusing to grant a mistrial. *Id.; Hammond v. United States*, D.C.App., 345 A.2d 140 (1975).

 In the case now before us, the court properly conducted a voir dire of the jurors who both stated that their impartiality remained unaffected by what they had heard. *See United States v. Evans*, 542 F.2d 805 (10th Cir. 1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977). Furthermore, we note that the juror who unequivocally advised the trial judge of having heard what was said, and therefore was the more likely of the two to be tainted, was an alternate who did not participate in the final deliberations. Finally, we must take into account the fact that when the government moved to replace the other juror, appellant's counsel opposed the motion, stating he preferred this juror to remain. We conclude under these circumstances that "the voir dire examination conducted below sufficed to ascertain the extent of prejudice flowing from the unauthorized communication and that the responses thereto rebutted the presumption of prejudice arising" therefrom. *Waller v. United States, supra* at 807; *see also Hammond v. United States, supra; Ryan v. United States*, 89 U.S.App.D.C. 328, 332, 191 F.2d 779, 783 (1951), *cert. denied*, 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691 (1952).

*Affirmed.*[11]

---

11. Appellant raises two other issues which we also reject. First, he claims that there was insufficient evidence to send to the jury the charges of first and second-degree murder. Viewing the facts in the light most favorable to the government, *Calhoun v. United States*, D.C. App., 369 A.2d 605 (1977), we find this claim unmeritorious. Secondly, appellant argues that the prosecutor's rhetorical questions during closing argument asking where the green shirt and pants were and why were they not produced as evidence was actually an impermissible comment on appellant's failure to testify at trial. The remark, when viewed in context, was not violative of appellant's rights.