Jabari BISHOP, Appellant

v.

UNITED STATES, Appellee.

No. 04–CF–853.

District of Columbia Court of Appeals.

Argued March 5, 2008.

Decided Nov. 25, 2009.

Jonathan W. Anderson, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief for appellant.

Elizabeth Gabriel, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee United States.

Before RUIZ and GLICKMAN, Associate Judges, and SCHWELB, Senior Judge.

RUIZ, Associate Judge:

Appellant, Jabari Bishop, appeals a judgment of conviction on a jury verdict finding him guilty of threatening to damage property and do bodily harm. *See* D.C.Code § 22–1810. He argues that the admission of his mug shot as part of a photo array constituted an abuse of discretion meriting reversal because (1) the government had no demonstrable need to introduce the photo array, (2) the mug shot, by itself, implied that he had a criminal

record, and (3) the manner in which the photo array was introduced drew attention to the police source of the photograph and the implication that appellant had a criminal record. Moreover, appellant argues, the trial court's curative instruction compounded the prejudice by informing the jury that appellant had been arrested in the past. We agree that the manner in which the mug shot was presented to the jury was improper. Because we cannot say that in the context of this trial the error was harmless beyond a reasonable doubt, we reverse and remand the case for a new trial.

## I. Factual Background

### The Government's Evidence

This prosecution originated from an incident involving the shooting of Jonnie Jackson's car in 2001, and a later incident, in 2002, in which Jackson was personally threatened with bodily harm as well as further damage to his car. At trial, the government relied primarily on the testimony of Jackson and appellant's half-brother, Brian Cabbell.[1] Jackson testified that during the early morning hours of August 23, 2001, he heard five or six gunshots coming from the front of his house. When Jackson went to his car in the morning, he saw that all four tires had been flattened and that there were bullet holes in the windshield, hood, and lights.

Jackson had bought his home on Wylie Street in December 2000, a few houses away from appellant's residence. Cabbell testified that he, appellant, Dennis, and a man named "Dion" were together on Wylie Street near Jackson's house when Jackson returned home in his car the night before August 23, 2001. According to Cabbell, when Jackson got out of his car, Dennis said, "Look at this faggy ass," to which appellant replied, "I can't stand his hot ass." According to Cabbell, this meant that appellant did not like Jackson because he had "called the police" to complain about his neighbors.[2] Cabbell recounted that when Dennis said, "You gotta go get that," referring to a gun that appellant had hidden earlier that night in a "cut" nearby, appellant responded, "Yeah, go get that." Dennis went to retrieve the gun and returned with it. Cabbell testified that appellant directed Dennis to shoot Jackson's car, which he did. The jury acquitted appellant of the charge related to the 2001 shooting of Jackson's car.

The incident underlying the convictions that concern this appeal (threatening to damage property and do bodily harm) occurred several months later, on the evening of March 16, 2002, when Jackson was moving his car from the front of his house to a church parking lot.[3] As he was walk-

---

1. Cabbell, a juvenile, is also referred to in the transcript as Brian Covell.

2. In the spring of 2001, Jackson began calling the police "on a regular basis" and contacted various city officials and agencies about noise, loitering, and litter problems on his block. At a community meeting held by the police in June 2001, a police sergeant identified Jackson as the "main" person who had been reporting neighborhood problems to the police. Jackson testified that after this community meeting, people on the block started treating him differently. Specifically, Jackson testified, appellant and his mother would stare at

him "in a very aggressive way" to intimidate him. Jackson also testified that people who "hung out" on the steps of appellant's home would yell things about Jackson and call him a "motherfucker" and an "A-hole." Jackson always "tried not to make eye contact" with appellant and the other people who harassed him.

3. Jackson testified that after his car was shot up on August 23, 2001, he continued to have problems with the people who congregated in front of appellant's home. According to Jackson, he had seen them drop trash in front of his house on one occasion. Jackson "did not

ing home, Jackson testified, a person asked him twice why he parked around the corner. Jackson turned, faced the speaker, and replied that he was parking his car somewhere else "[b]ecause you shot it up once, and I don't want you to shoot it up again." At first, Jackson, who had never spoken directly with appellant before that night, "didn't even know that that was [appellant]." Nonetheless, Jackson "thought he recognized [appellant's] voice, but [I] didn't see him speaking at that time." Jackson recognized appellant moments later, however, because he had "something different about ... one of his eyes," which Jackson had noticed on a previous occasion as well.[4] Jackson testified that appellant then threatened to shoot him and his car: "Well, I know where you park it, bitch, and I'm going to shoot it up again, bitch," adding, "I know where you live. I'm going to shoot you, bitch." Jackson called the police station a few minutes later and spoke with Detective Alfred Austin–Braxton. Jackson told the detective that "Jabari Bishop" had threatened him.

Two days later, Jackson went to the police station. Detective Austin–Braxton showed Jackson a photo array, and Jackson picked appellant's picture as the person who had threatened to shoot him and his car. Jackson's 911 call to Detective Austin–Braxton and the photo array were admitted into evidence.

### The Defense Case

Appellant's defense was that he did not commit any of the charged crimes, and that it was Dennis, not appellant, who had shot up Jackson's car on August 23, 2001, and threatened Jackson on March 16, 2002. Appellant's prior attorney, Todd Baldwin, Esq., testified that Dennis had admitted to him that he (Dennis) had shot up Jackson's car and threatened to injure Jackson and shoot his car again.[5] The defense argued that Jackson was angry about what he considered rowdy and noisy behavior centered in appellant's house on the same block as the home he had recently purchased and had fabricated the accusation he made against appellant. As noted, the jury acquitted appellant of shooting up Jackson's car in August 2001, but it found him guilty of making the threats in March 2002.[6]

### II. The Photo Array

Detective Austin–Braxton testified during direct examination about the identification procedure he conducted when Jackson went to the police station on March 18, 2002. The detective pulled up a photo

---

feel that it was safe" to park his car in front of his house, so he began to use a church parking lot a few blocks away.

4. Cabbell corroborated the fact that there was something different about one of appellant's eyes. According to Cabbell, it was a "fake" eye.

5. As it became clear that Mr. Baldwin would be a witness at trial, he withdrew as counsel, and the Public Defender Service was appointed to represent appellant at trial.

6. Appellant was indicted on six counts: (1) carrying a pistol without a license, D.C.Code § 22–4504(a) (2001); (2) possession of unreg-

istered firearm, D.C.Code § 7–2502.01; (3) unlawful possession of ammunition, D.C.Code § 7–2506.01; (4) destruction of property, D.C.Code § 22–303 (2001); (5) threatening to damage property, D.C.Code § 22–1810; and (6) threatening to do bodily harm, D.C.Code § 22–1810. The trial court granted the government's motion to dismiss counts 2 and 3.

After the jury found appellant guilty of threatening Jackson, the trial court sentenced appellant to ten years of incarceration and three years of supervised release on each count, to run consecutively. The sentence was suspended entirely, and appellant was placed on supervised probation, for two and a half years on each count, with the periods of probation to run consecutively.

array on a "live scan" computer and showed it to Jackson, who identified appellant. The prosecutor asked the detective how he composed the array, and the court *sua sponte* called the parties for a bench conference. The court expressed concern that this line of questioning might lead to testimony about appellant's prior record or prior contact with the police. The court also questioned the relevance of the photo array, since identification did not appear to be a "crucial" issue, and noted that it was the "court's prerogative to pretty much limit this type of information so it doesn't spill into anything that's inappropriate." The court did not at that point limit the testimony concerning the photo array, however, because defense counsel changed the subject and directed the court's attention to another issue of concern.

The prosecutor asked the detective if there was any difference between the copy of the photo array and the array that was shown to Jackson at the police station. Detective Austin–Braxton responded, "On this one, it has the PDID [Police Department Identification] number." Appellant objected to this line of inquiry, and the court sustained the objection. When the prosecutor requested that the judge admit the copy of the photo array, defense counsel objected and moved for a mistrial. Counsel then requested, "as a sanction to the government" for eliciting the reference to the PDID numbers, that the photo array not be admitted into evidence. The trial judge stated:

> I'm assuming that the jury doesn't know what a PDID acronym stands for. If they can figure that out, then we may have some difficulty. However, there is that instruction that—about mug shots that [police] may have of people for reasons other than [a prior arrest]. The court can give such an instruction.

The prosecutor proposed deleting the PDID numbers on the photo array that would be admitted as an exhibit. The court, believing that the "numbers are absolutely meaningless to anyone unless they have information about what they stand for" and that "they may just be innocent numbers," initially rejected the proposal. Defense counsel protested that the photographs in the photo array appeared to be mug shots and asked that they be excluded, or, if admitted, that a limiting instruction be given. Specifically, counsel requested that the trial court give Alternative A of Redbook Instruction No. 1.15. See note 8, *infra.*

Counsel also objected to admission of the photo array based on relevance grounds. Because appellant had already moved for suppression of Jackson's identification from the photo array in a pretrial hearing, the court recognized that identification had been an issue in the case. Having denied the suppression motion, the court inquired, "Will identification be an issue?" If identification were still an issue, the court reasoned, then in addition to Jackson's testimony that he had seen appellant in the neighborhood on a regular basis, the photo array would be relevant and admissible to confirm the accuracy of his identification. However, in the court's view, the photo array was cumulative, "considering the live testimony of the witnesses so far."

The prosecutor argued that admission of the photo array was relevant to "[Jackson's] veracity when he identifies the person in the photo array as the person who threatened him." The prosecutor suggested that he could "white out" the numbers on the photo array and bring in a clean copy, without any numbers. Without any further objection from defense counsel, the court agreed with this solution and admitted the photo array into evidence.

## III. Analysis

Our jurisprudence limiting the use of mug shots at trial harkens back to *Barnes v. United States,* 124 U.S.App. D.C. 318, 365 F.2d 509 (1966), where the U.S. Court of Appeals for the D.C. Circuit stated:

It is well-settled law that the criminal record of a defendant may not be introduced into evidence at trial unless the defendant takes the stand or otherwise places his character in issue. A photograph which on its face reveals the existence of such a criminal record is likewise inadmissible when the defendant's character has not been placed in issue.

*Id.* at 319, 365 F.2d at 511 (footnote citations omitted).

■ While recognizing "the competing interests involved in the admission of mug shots," we have "adopted rigid criteria for their admissibility," *Letsinger v. United States,* 402 A.2d 411, 414 (D.C.1979), through a three prong conjunctive test. For admission of "mug shot type" photographs at trial:

1. The government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

*(Kirk) Williams v. United States,* 382 A.2d 1, 5 (D.C.1978) (citing criteria set forth in *United States v. Harrington,* 490 F.2d 487, 494 (2d Cir.1973)). We apply the three prong test to the facts of this case, and conclude it was not met.

### 1. *Demonstrable Need*

The identity of the person who shot at Jackson's car and who threatened him was a contested issue at trial. In opening statement, defense counsel theorized that "Michael Dennis and Michael Dennis alone [was the one] who shot up [Jackson's] car and who threatened seven months later to shoot it up again." Appellant challenged Jackson's ability to identify the person who threatened him, contesting both Jackson's familiarity with appellant and his opportunity to see him on the night the threats were made. During cross-examination, defense counsel vigorously questioned Jackson about his identification of appellant. Counsel probed Jackson about the fact that he did not initially recognize appellant when he was threatened on March 16, 2002. Defense counsel established that Jackson was in the middle of the street, about fourteen feet away from the person who threatened him, and that the person never moved toward Jackson in any way during this encounter. Counsel also confronted Jackson with the fact that he had never before directly spoken with appellant before that night and always "tried not to make eye contact" with appellant and the other people who harassed him. Defense counsel then attempted to discredit complainant's identification of appellant's photograph from the photo array two days after the incident. For example, counsel elicited the fact that complainant had not confidently stated, "That's the man who threatened me," and did not identify appellant by name, although he had done so when he spoke to the police during the 911 call. This theme continued during closing argument, when defense counsel questioned Jackson's in-court identification of appellant:

Now, think about the identification. Jonnie Jackson was asked, do you see the person that threatened you? What did he say? Not "yes, for sure, that's

him. That is the guy who did it. . . ." So when he made the identification, why wasn't he a little more sure? What did he tell you? That looks like him, but his hair was a little different.

Because the photo array was probative of the accuracy of Jackson's identification of appellant, the government contends it had a "demonstrable need" to introduce it into evidence. *See Letsinger,* 402 A.2d at 414 (holding that government had "demonstrable need" to introduce arrest photos of defendant where identity was a "key" issue at trial).

Appellant, however, argues that at no point during the trial did the defense challenge the composition of the photo array itself. And, appellant contends, defense counsel placed principal emphasis in closing argument on Jackson having fabricated the allegations against appellant because "[h]e wanted the Bishops off the block," and "exaggerate[s] to the extreme. I mean, he told you that he wrote a letter to . . . John Aschroft . . . [about] terrorism . . . [on his block.]." But, as outlined above, defense counsel's closing argument also followed (though to a lesser extent) the cross-examination that questioned the accuracy and certainty of Jackson's identification of appellant. In light of this dual attack on Jackson's identification—primarily as biased and fabricated but also as mistaken—this case falls somewhere between *Letsinger,* where we determined that the government had a "demonstrable need" to introduce the photograph, 402 A.2d at 414, and *(Kirk) Williams,* where we held there was no such need. *See (Kirk) Williams,* 382 A.2d at 5–6 (government did not have "demonstrable need" to show that complainant selected defendant's photo from an array where "government adduced more than sufficient testimony regarding positive photographic identification" and "it was not necessary to introduce the photos themselves"). For present purposes we will assume, without deciding, that the prosecutor was entitled to buttress the identification by introducing the photo array from which Jackson identified appellant. *See Barnes,* 124 U.S.App. D.C. at 321, 365 F.2d at 512 ("[W]e may assume, without deciding, that the prosecution was entitled to buttress its witness identification testimony on redirect [by using mug shot of defendant.]").

## 2. *Implications from the Photograph*

■ The concern about the introduction of mug shots is the "inherent implication of criminal activity which the photographs convey." *(Kirk) Williams,* 382 A.2d at 5. The pictures introduced in this case were not the typical "mug shots" that were introduced in *(Kirk) Williams* and *Barnes.* In *Barnes,* the government introduced the classic "mug shot," front and profile shots alongside each other. *See* 124 U.S.App. D.C. at 319, 365 F.2d at 510. Moreover the array of mug shots considered in *Barnes* was shown to the jury with a wide strip of adhesive tape covering the prison numbers on the bottom half of the photographs, which the court deemed equivalent to an admission of Barnes's "criminal record," and thus, impermissible. *Id.* Similarly, in *(Kirk) Williams,* the government disguised the "typical mug shots" of the defendants by blacking out the numbers placed across their chests, thus creating an "inherent implication of criminal activity." 382 A.2d at 5 (noting that disguise was tantamount to the accentuating use of tape in *Barnes* ). In both cases, the "poorly doctored 'mug shots,' " inevitably created the implication that the defendants in those cases had prior criminal records. *Id.; see also Barnes,* 124 U.S.App. D.C. at 320–321, 365 F.2d at 511–512.

The photo array introduced at appellant's trial in this case is a hard copy of the

"live scan" electronic version that was shown to Jackson at the police station. What is relevant to our analysis is how the pictures looked at the time of their admission at trial. The array shows front view close-ups of nine men against a blank background. Unlike in *Barnes* and (*Kirk*) *Williams,* nothing looked disguised and there were no prison numbers on appellant's chest to be covered. The prosecutor here made "suitable arrangements" by "deleting" the PDID numbers and introducing a clean copy of the photographs with no indication that there had been any numbers or other obviously prejudicial information. *See, e.g.,* (*Lenwood*) *Williams v. United States,* 481 A.2d 1303, 1305 (D.C. 1984) (noting that "photographs were appropriately cropped"); *see also Letsinger,* 402 A.2d at 414 (commenting that "prosecutor cropped the bottom portion of the mug shot which contained the potentially prejudicial information; hence, the jury ... could draw no adverse inferences ...").[7] Although all the photographs in the array are clearly neither candids nor school pictures and share the characteristics of mug shots—the somber look on the suspect's face, the close shot to the face and the blank backgrounds—those similarities are not dispositive, for otherwise no mug shots could ever be introduced at trial, and we have permitted their admission in certain circumstances. *See Letsinger,* 402 A.2d at 414 (noting that pictures admitted were front and side views of appellant but had no police numbers). Because neither the photograph of appellant nor the array as a whole clearly conveyed that appellant had a police record,

we conclude that the photographs could have been shown to the jury.

3. *Manner in which the Photograph was Introduced*

■ We cannot say the same, however, about the manner in which appellant's photograph was presented to the jury. After Detective Austin–Braxton said during direct examination that the photo array displayed "PDID" numbers, the trial judge "assum[ed] that the jury doesn't know what a PDID acronym stands for. If they can figure that out, then we may have some difficulty." With this statement, the judge recognized the reasonable inference a juror would draw from a police number on appellant's photo, that is, that appellant had a prior record for which he was assigned an identification number by the police. We think that the trial court's assumption may impute too much naïveté to jurors—"PDID" is a fairly-easy-to-decipher acronym for Police Department Identification Number—particularly here, where the jurors also heard that the source of the photo array was a police department computer.

But any doubt or inadvertence that the jury might have entertained was overcome by the court's "curative" instruction, which clearly identified appellant's picture as a "police photograph" and told the jury that appellant, in fact, had an arrest record. Over defense counsel's objection, the trial court gave Alternative B of instruction 1.15 of the Criminal Jury Instructions for the District of Columbia:[8]

[The] court has admitted into evidence *a police photograph* of the defendant that

---

7. It would therefore appear that the live scan array shown to Jackson at the police station had the PDID numbers. If so, that would have been relevant to the motion to suppress the identification Jackson made from the photo array—an issue that is not before the court in this appeal.

8. Defense counsel had requested, with the government's acquiescence, that the court give Alternative A of instruction 1.15, which reads:

There has been some reference in the testimony to photographs of the defendant. In that regard, I want to instruct you that the police can obtain photographs of people in

was part of an array of photographs shown to witnesses in this case. *You may conclude from the existence of the photograph that the defendant had been arrested previously.* However, as I am certain you know, an arrest is not the same thing as a conviction for a crime. Indeed, frequently charges are dropped against the arrested person even before they are brought to court. Therefore, simply because the police have a person's picture does not mean that he has committed a crime.

Now, the photograph of the defendant has been admitted into evidence because the parties agree that viewing ... the actual photographs shown to the witnesses may assist you in determining the accuracy of any identification by them and for no other reason.[9]

You may not consider *the fact that the defendant had been arrested previously* as any evidence of his guilt as to this or any other crime. Furthermore, you are not to speculate or guess in any way as to *why the defendant might have been arrested* and what, if anything, happened to that charge.

(Emphasis added.)

These instructions did not merely permit the jurors to infer that appellant might

have had some kind of criminal record; they effectively told the jurors that appellant's picture was one the police already had at the time it composed the array and informed them of the "fact that the [appellant] had been arrested previously." Once the judge instructed the jury, there was no longer merely a *"probability* that [the mug shots] ... impressed upon the jury the fact [that] appellant [had] a prior criminal record," *Barnes,* 124 U.S.App. D.C. at 321, 365 F.2d at 512 (emphasis added), because at that point, appellant's prior arrest became a fact stipulated by the judge. The prejudice was greater in this case than it was in *Barnes* and *(Kirk) Williams,* which resulted in reversal, because in those cases the court entertained some doubt "whether the jurors remained in ignorance of the fact that the photographs ... had to do with some criminal record of the defendant." *Id.* at 320, 365 F.2d at 511. The jurors in appellant's trial were not in doubt; they were told—by no less authority than the judge—that appellant had been arrested. Because the manner in which appellant's photograph was introduced drew "particular attention to the source [and] implications" of a criminal history, its admission was in error. *(Kirk) Williams,* 382 A.2d at 5.[10]

---

many different ways, such as from newspapers, school records and yearbooks, employers, driver's license files, and friends or members of a person's family. Therefore, simply because the police have obtained a person's picture does not mean that s/he has ever committed a crime. So please understand that there is no connotation of guilt of any kind because the police obtained a picture of the defendant.
CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 1.15 (4th ed.2002).

9. As noted, however, defense counsel never agreed, and, indeed, objected to the relevance of the photo array.

10. We are not persuaded by the government's argument that we should revisit the premise underlying our jurisprudence that mug shots must be excluded if they are suggestive of a criminal record, a line of cases that is rooted in our cases prohibiting, as unduly prejudicial, evidence of other crimes, "unless the defendant takes the stand or otherwise places his character in issue." *Letsinger,* 402 A.2d at 415 (quoting *Barnes,* 124 U.S.App. D.C. at 319, 365 F.2d at 510). According to the government's brief, we should consider that jurors in the District of Columbia are no longer negatively influenced by knowledge that a defendant has a criminal arrest record. The government relies on the observation by the U.S. Court of Appeals "that [the fact that a

## IV. Harmless Error

■ Because the limitation on the use of mug shots at trial has "constitutional underpinnings," error in their admission "must be addressed in the context of constitutional harmless error." (*Lenwood*) *Williams*, 481 A.2d at 1306 (assuming error in introduction of mug shots and, citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), finding it harmless beyond a reasonable doubt). Thus, reversal is required unless the government can show that the error was "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824.

The government contends that any error in the admission of mug shots should be evaluated under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), relying on *(Kirk) Williams*, which preceded *(Lenwood) Williams*. *See, e.g., M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971) ("[W]e have adopted the rule that no division of this court will overrule a prior decision of this court or refuse to follow a decision of the United States Court of Appeals rendered prior to February 1, 1971, and that such result can only be accomplished by this court en banc.") (footnote omitted). While *(Kirk) Williams* did cite *Kotteakos*, it concluded that the error in that case required reversal under that less-exacting standard. *See (Kirk) Williams*, 382 A.2d at 7. Therefore, application of *Kotteakos* was not essential to the decision. Moreover, the court provided no reasoning why it applied *Kotteakos* rather than *Chapman*, and cited

no authority. Because in *(Kirk) Williams*, "the judicial mind was not asked to focus upon, and the opinion did not address, the point at issue," *Alfaro v. United States*, 859 A.2d 149, 154 (D.C.2004) (quotations omitted), it is not binding on us for this purpose.

We recognize that there is a possible tension between the application of constitutional harmless error analysis to the erroneous admission of mug shots because they implicate the defendant's constitutional rights, and application of the less stringent non-constitutional harmless error analysis to the erroneous admission of other crimes evidence. *See, e.g., Parker v. United States*, 751 A.2d 943, 949–50 (D.C. 2000) (applying *Kotteakos* to erroneous admission of other crimes evidence); *Veney v. United States*, 936 A.2d 811, 828 (D.C. 2007) (same). Although *(Lenwood) Williams* did not identify the constitutional right implicated by admission of mug shots, the reason for exclusion is that they place the defendant's "bad character" in evidence, which runs the risk that the jury will consider that bad character in deciding whether to convict of the charged crime. *See* 481 A.2d at 1306. This deprives the defendant of the presumption of innocence. *See generally In re Winship*, 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (referring to the presumption of innocence as "that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law' ") (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 39

---

defendant] may have been arrested for something at some time is unlikely to have much impact on a District of Columbia jury." *United States v. (Eric) Williams*, 324 U.S.App. D.C. 290, 294, 113 F.3d 243, 247 (1997) (discussing prejudice to defendant resulting from government witness's reference to "prior arrest photo" of defendant). Even assuming that we, as a division of the court, were free to

reconsider the question of the likely prejudicial impact of mug shots on the jury, there is no support for the government's contention. Neither the court in *(Eric) Williams*, nor the government in this case, has cited evidence or studies supporting the claim that D.C. jurors no longer make much out of a person's previous brushes with the police.

L.Ed. 481 (1895)); *(Kirk) Williams,* 382 A.2d at 7 (holding that mug shots were not harmless as "jury might well have been influenced because of the improper, indirect proof of appellants' criminal pasts").

Similarly, the prohibition against the admission of evidence of uncharged crimes committed by the defendant (commonly referred to as "other crimes evidence") derives from the principle that such evidence "may never be admitted solely for the purpose of proving that the defendant committed the other crime because that fact is *irrelevant as a matter of law* to the offense of which the defendant is charged." *Bolanos v. United States,* 718 A.2d 532, 543 (D.C.1998) (Ruiz, J., concurring) (citing *Campbell v. United States,* 450 A.2d 428, 430 (D.C.1982) ("It is fundamental to a system of criminal justice based on the presumption of innocence, that the process of adjudication be insulated from evidence of past criminal or wrongful conduct of an accused other than the charged offense.")). Our cases follow the reasoning of *Drew,* where the court cited Judge Stephens's concurring opinion in *Martin v. United States,* 75 U.S.App. D.C. 399, 401, 127 F.2d 865, 867 (1942), as "the leading authority in this jurisdiction" on the exclusion of evidence of other crimes. *Drew v. United States,* 118 U.S.App. D.C. 11, 15 n. 7, 331 F.2d 85, 94 n. 7 (1964). In that concurrence, Judge Stephens quoted at length from an opinion of the Supreme Court of Ohio, *Whiteman v. State,* 119 Ohio St. 285, 164 N.E. 51, 52 (1928):

In the trial of a person accused of a particular crime it is a general rule that evidence of previous or subsequent commission of other crimes, not connected with that for which he is on trial, is not admissible. This rule is simple enough and is founded on reasons which have stood the test of time. The accused in fairness can only be expected to meet the accusations of the indictment, and is

favored throughout with the *presumption of innocence* of even those accusations. The real meaning of this rule is that evidence of collateral offenses must never be received as substantive evidence of the offense on trial.

*Martin,* 75 U.S.App. D.C. at 403, 127 F.2d 865, 869.

It therefore appears that the presumption of innocence lies at the heart of the rules against admission of mug shots and of evidence of unrelated other crimes. Consequently, one would expect that the same level of harmless error analysis would apply to both. Nonetheless, as we are bound by the *(Lenwood) Williams* precedent, which is consistent with our understanding of the constitutional basis for the presumptive prohibition on the admission of mug shots, we apply constitutional harmless error analysis and conclude that the government cannot meet its burden in this case.

■ In considering whether the error was harmless beyond a reasonable doubt, we must reject the government's argument that any harm was "cured" by the latter part of the instruction which cautioned the jurors that an arrest does not mean that the arrestee is guilty of the offense for which he was arrested. We have said, specifically with respect to erroneous admission of prior arrest photos, that "it has been recognized that in the face of seriously prejudicial evidence, curative instructions ... are of minimal worth" in assuaging any fears of undue prejudice. *(Kirk) Williams,* 382 A.2d at 7. Moreover, because the jurors should not have been informed that appellant had previously been arrested, "there [is] no necessity to indulge in the questionable assumption that ... they actually can consider evidence only for a specific, narrowly defined purpose," *id.,* that is, for determining the

accuracy of the identification. As we have said,

> Cautionary instructions, such as the one given in this case, are designed primarily to blunt permissible prejudice, i.e., to prevent an inference of criminal record when [mug shots] are properly admitted for a valid purpose such as identification. They cannot cure impermissible prejudice. Counsel, as well as trial courts, ought not to ignore clear legal precedent, believing that all can be remedied by curative instructions; we do not wish to encourage such a trend of practice.

*Id.*

■ "[A]nalysis under the harmless error doctrine should not be limited to superficial inquiry as to whether the same verdict would have been possible absent the tainted evidence. We must, at least, look to the impact of the tainted evidence on the jury, momentarily divorced from consideration of the strength of the other evidence." *(Lenwood) Williams,* 481 A.2d at 1306 (citation and quotations omitted). Based on our review of the trial as a whole, we conclude that the admission of appellant's mug shot and the court's instruction that appellant had an arrest record could have had an influence on the jury. This is a case where a police detective testified that the police had been called on numerous occasions because of noise late into the night and generally rowdy behavior emanating from appellant's home. Detective Austin–Braxton also described the neighborhood and stated that the police had received "disorderly complaints" and reports of "loud music, . . . sounds of gunshots, [and] subjects selling drugs."[11] He testified that he knew

appellant's family and that he could recognize appellant from "working in the area"—which the jury could have understood as a thinly-veiled reference to appellant's other unlawful conduct. In closing, the prosecutor emphasized the theme, characterizing Jackson as "the neighbor you want to have" and appellant as "the neighbor you don't want to have." These repeated references to appellant's bad character, bolstered by the fact that appellant had an arrest record, could have persuaded the jury to overlook weaknesses in the government's case because appellant was a neighborhood troublemaker.

The government's evidence, though sufficient to convict, was not so strong as to overcome our concern about the possibility that undue prejudice influenced the verdict. Like in *(Kirk) Williams,* the complainant in this case (Jackson) "was the lone eyewitness and very little corroborative evidence of violence [directly linking appellant]" surfaced at trial, so "[t]he jury might well have been influenced because of the improper . . . proof of appellant[ ]'s criminal past[ ]." 382 A.2d at 7; *see also Barnes,* 124 U.S.App. D.C. at 319, 365 F.2d at 512–13 (reversing where mug shot was improperly admitted and only one eyewitness identified the defendant). Here, there was no physical evidence and appellant made no inculpatory statements. Moreover, there was testimony from a member of the bar that someone else, Michael Dennis, had admitted that he shot at Jackson's car in 2001 and threatened Jackson in 2002. The jurors disbelieved the evidence that appellant was guilty of the shooting of Jackson's car in 2001, and acquitted appellant of that charge. The

---

11. The trial court gave a limiting instruction to the jury:

> [T]hat testimony is simply being allowed to describe the street. It's not being permitted for you to make any connection whatsoever

that Mr. Bishop, the defendant in this case, partook, acted, or had anything to do with any of those activities because there is no such evidence in the case.

entire case, in other words, came down to Jackson's identification, which was challenged as biased and unreliable.

Considering the evidence against appellant and the overall tenor of the prosecution that called appellant's character into question, we conclude that admission of appellant's mug shot, along with the trial judge's "curative" instruction, was not harmless beyond a reasonable doubt. Thus, we reverse and remand for a new trial.

*So ordered.*