Kirk D. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

Melvin O. JONES, Appellant,

v.

UNITED STATES, Appellee.

Nos. 10108, 10200.

District of Columbia Court of Appeals.

Argued Oct. 13, 1977.

Decided Jan. 5, 1978.

Richard A. Rosen, Public Defender Service, with whom Mildred M. Matesich and Frederick H. Weisberg, Public Defender Service, Washington, D.C., were on the brief, for appellant in No. 10108.

Charles F. Stow, III, Springfield, for appellant in No. 10200.

Lillian A. McEwen, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and John T. Kotelly, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEBEKER, YEAGLEY and FERREN, Associate Judges.

FERREN, Associate Judge:

This case presents issues of trial court error in (1) permitting police "mug shots" to be received into evidence against appellants, and (2) refusing to sever their trials. We hold, on the authority of *United States v. Barnes*, 124 U.S.App.D.C. 318, 365 F.2d 509 (1966), that the admission of the photographs into evidence was reversible error. We further hold that the trial court did not abuse its discretion in denying the requested severance.

## I.

Appellants were charged with and convicted of rape (D.C. Code 1973, § 22–2801), rape while armed (D.C. Code 1973, §§ 22–2801, –3202), sodomy (D.C. Code 1973, § 22–3502), robbery (D.C. Code 1973, § 22–2901), and armed robbery (D.C. Code 1973, §§ 22–2901, –3202).[1] These charges were based upon the account of events by the complainant.

A. According to complainant, at approximately 2:30 p. m. on March 26, 1974, she took a bus to the corner of Sixth and East Capitol Streets, intending to meet a friend and then embark on a job-hunting expedition. Not finding her friend at that location, complainant began to look for the friend's house. Two young men, appellants Williams and Jones, approached to offer assistance. Hoping to expedite the search, complainant accompanied them "up the street and around the corner" to Williams' home, where she asked to use the telephone,

---

1. The original thirteen-count indictment was reduced to five counts when the government, just prior to commencement of trial, moved to dismiss eight of the counts.

called and spoke with her friend, and then turned to find Jones pointing a sawed-off shotgun at her. (She later deduced that the gun had been concealed inside a brown shopping bag carried by Jones.)

Complainant testified that the appellants forced her, as she struggled, upstairs and into a bedroom, where they struck her (causing an earring to fall off), raped her and committed sodomy, and robbed her of her watch, seven dollars and an identification card. During the course of this attack, appellant Williams departed once to investigate a knock at the front door of the house. After completing these crimes, appellant Williams threatened to kill complainant with a drug overdose. Soon thereafter, one of the appellants gave her forty cents for bus fare home, and the three proceeded downstairs, encountering and greeting Williams' sister. Complainant left her name and her mother's phone number on a piece of paper, and appellants escorted her outside.

Complainant further testified that she took numerous cleansing measures, called to inform her sister that she had been "robbed" (and that she would tell all about it later), and then walked to her mother's home. Her sister's call to the police precipitated an investigation. Complainant led the police to Williams' house, telling them that she had lost her earring and forgotten her pantyhose during the course of events there. She also turned over some of her clothing as evidence, submitted to examination at George Washington University Hospital, and positively identified Williams and Jones from police photographic arrays and, later, at lineups. The results of the medical examination were inconclusive as to any recent intercourse, forced or consensual, or as to any struggle; the doctor found no sperm and only a few superficial scratches on her person. A search of Williams' house, pursuant to a warrant, yielded an earring and a pair of pantyhose.

B. Appellant Williams told a different tale, raising a consent defense at trial. He admitted only to having relations with a willing complainant and denied committing sodomy or robbery.

Williams testified, more particularly, that he did meet complainant at the corner; that she asked him where a certain address was located and where she could find a phone; that he offered his phone, and she accompanied him to his home; that en route they encountered his friend appellant Jones (whom he also had seen briefly that morning), and that he stopped to converse with Jones for ten minutes. Williams further testified that he, alone, entered his home with the complainant, helped her place a call to her friend, smoked some marijuana with her, and then had intercourse with her. He said that afterwards she was angered by the apparent disappearance of her watch and accused him of thievery. He then informed her that she must leave because he was expecting a friend. She wrote her name and phone number on a piece of paper, for purposes of a possible future meeting, and departed.

C. Appellant Jones' story was still different. He denied ever seeing the victim. With the aid of testimony from his mother and a girlfriend, he presented an alibi defense. He specifically denied seeing appellant Williams on the afternoon of the 26th, although he confirmed Williams' testimony that they had met briefly during the morning.

D. Jones surrendered after hearing that the police wanted him. Williams attempted to elude the police, but eventually was apprehended on the roof of his home. Jury trial began January 23 and ended January 27, 1975, with verdicts of guilty as to both appellants on all counts. On April 8, 1975, the trial judge sentenced Jones to ten years under the Federal Youth Corrections Act, 18 U.S.C. § 5010(c) (1970).[2] On October 2, 1975, the judge sentenced Williams to fifteen years on each count, to run concurrent-

2. Because of the merger of offenses, appellants were sentenced only on the rape-while-armed, sodomy, and armed-robbery counts.

ly, under the F.Y.C.A. Both have appealed.[3]

## II.

During the course of the trial, over objections by counsel for appellant Williams, the court permitted the government to introduce into evidence police "mug shots" of both appellants (with the numbers blacked out) which complainant had selected from a photographic array.[4] Earlier in the trial, complainant and an investigating officer had testified regarding the conduct of the photographic identification session and the resulting identification of appellants.[5]

Appellants now contend that admission of the "mug shots" had no probative value and created serious prejudice by insinuation of past criminal activity. We agree, for we find these cases directly within the preview of the prohibition established by *United States v. Barnes, supra,* and its progeny.[6]

A. In *Barnes,* the trial court permitted the prosecutor to introduce defendant's "mug shot" into evidence after defense cross-examination of the government eyewitness had "focused on identification," including the fact that she had "initially identified appellant from photographs shown to her by the police." *Id.* 124 U.S.App.D.C. at 319, 365 F.2d at 510. The photograph at issue was characterized by the appellate court as "a typical 'mug shot' from a police department 'rogues' gallery,' . . . two close-up shots of appellant's face side by side, one full face and one a profile photograph." *Id.* The prison numbers and other writing on the photo had been concealed by tape and pieces of paper.

The *Barnes* court observed that unless a criminal defendant takes the witness stand or otherwise puts his or her character in issue, a criminal record is inadmissible, either directly or indirectly by way of "mug shot" photographs. Such photographs are so familiar, from "wanted" posters in the post office, motion pictures and television, that the inference that the person involved has a criminal record, or has at least been in trouble with the police, is natural, perhaps automatic. [*Id.* 124 U.S. App.D.C. at 319–20, 365 F.2d at 510–11.] The court rejected the "rudimentary" attempt to disguise the nature of the pictures by using the overlays of paper and tape, noting that the inevitable emphasis therefrom "may well have heightened the importance of the picture and the prejudice in the minds of the jury." *Id.* 124 U.S.App.D.C. at 320, 365 F.2d at 511. The court held the error reversible because the prejudice from presentation to the jury was "too substantial for [the court] to ignore," *id.* 124 U.S. App.D.C. at 321, 365 F.2d at 512, especially in the absence of any legitimate and demonstrable counterbalancing government need. (Another photograph, perfectly adequate to bolster identification, had also been admitted.)

More recently, in *United States v. Harrington,* 490 F.2d 487 (2d Cir. 1973), the Second Circuit has elaborated the criteria

---

3. On August 8, 1975, appellant Jones filed a motion to set aside and reimpose his sentence, in order to permit an appeal (the ordinary time for appeal having expired). In support of the motion, he filed statements by his mother and stepfather showing that they had attempted to help appellant perfect an appeal and had been told by counsel that he was tending to it—which turned out not to be the case. The government accordingly did not oppose the motion. *See Rodriguez v. United States,* 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969); *Hines v. United States,* D.C.App., 237 A.2d 827 (1968). The trial court granted appellant's motion, entering a judgment and commitment order an October 1, 1975. Consequently, appellant's notice of appeal of October 3, 1975, was timely.

4. Originally, only appellant Williams raised this issue on appeal. At oral argument, however, counsel for Jones requested and received leave to join Williams' claim. Therefore, we consider the alleged error—the admission of the police photographs of each appellant—in both cases.

5. During the officer's testimony and examination of the photographs, Williams' counsel objected to the inadvertent display of the pictures to the jury. In response, the Assistant United States Attorney agreed to caution the witness against such accidental exposure.

6. This court is bound by the *Barnes* precedent. *M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971).

applicable to submission of actual "mug shots" to the jury. From an analysis of *Barnes* and later cases, the *Harrington* court

perceive[d] three prerequisites to a ruling that the introduction of "mug shot" type photographs does not result in reversible error:

1. The government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs. [*Id.* at 494–95.]

We find *Barnes* controlling and *Harrington* instructive on the pertinent standards. We therefore turn to their application to the facts in each of the present cases.

■ B. In appellant Williams' case, the government asserts that its right to demonstrate a fair pretrial identification satisfied the first *Harrington* criterion, "demonstrable need," because

[t]he importance that [the] jury know of the reality of a fair pretrial identification [*e. g.*, while viewing "mug shots"] weighs with more substance on the scales of justice than speculative possibility that the jury may conjecture defendant was involved in some other offense. [*United States v. Hallman*, 142 U.S.App.D.C. 93, 94–95, 439 F.2d 603, 604–05 (1971).]

This contention is specious on the facts here. First, the prosecutor knew more than two months before trial from Williams' motion to sever defendants that Williams would present a consent defense and that

identification accordingly was not in issue. Again, during discussion of preliminary matters on the day of trial with government counsel present, Williams' attorney informed the court that his client's defense was consent. Consequently, but for the need to survive a motion for judgment of acquittal at the close of its case, the government had no reason to show identification. The government adduced more than sufficient testimony regarding positive photographic identification of appellant to satisfy that need; it was not necessary to introduce the photos themselves.

The real prejudice, of course, comes not so much from the absence of a need to introduce photographs; it comes from the inherent implication of criminal activity which the photographs convey—*Harrington's* second criterion. The photos admitted in this case matched the description of those condemned in *Barnes*. The government's attempt to disguise the photographs by blacking out the numbers placed across appellants' chests was tantamount to the accentuating taping done in *Barnes*.[7] The character of these poorly doctored "mug shots," coupled with the absence of legitimate prosecutorial need, brings this case squarely within the ambit of the *Barnes* prohibition, and thus requires a finding of error.[8]

■ C. In appellant Jones' case, from discussion among counsel and the court prior to trial, the government knew that identity *would* be placed in issue by an alibi defense. The government, therefore, could legitimately claim the right to demonstrate a fair, meaningful pretrial identification. The prosecution had a demonstrable need to show that complainant had previously selected the appellant's photo from an array. The problem arises, however, from the

7. Since no need for introducing the photographs has been shown, this court, as in *Barnes*, has

no need to consider here whether, if the prosecutor has a need and legitimate reason for presentation of the other photographs [*i. e.*, the "mug shots"], he may do so *by making suitable arrangements, by separation and copying, avoiding the incriminatory preju-*

dice. [*Id.*, 124 U.S.App.D.C. at 321, 365 F.2d at 512; emphasis added.]

8. Although we need not discuss the third *Harrington* criterion—manner of introduction—we note that the record does not reveal an objectionable mode of submission of the photos to the jury (*e. g.*, extended argument as to admission and masking in the jury's presence).

mode chosen to serve that need. By introducing inadequately masked "mug shots" of appellant Jones, the prosecutor chose an impermissible method of proof and violated the second *Harrington* standard—that the photographs themselves must not imply prior criminal conduct.

The existence of some need to prove identification does not open the door to the manner of proof used here. *Barnes* itself involved a probative purpose; the defense had attacked the witness's identification capacity. But "mug shots" were rejected because of an adequate alternative means of proof. In appellant Jones' case, the testimony of the witness and the officer as to the conduct of the photographic array, coupled with the resulting positive identification, made evidentiary use of the photos themselves superfluous. Moreover, even if we assume that the government's case required that tangible photographic evidence go before the jury in order to persuade it of the validity and reliability of complainant's identification, we cannot condone admission of the ineptly disguised "mug shots." And we stated earlier (note 7, *supra*), *Barnes* allowed for the *possibility* of the use of the likenesses contained in the mug shots, upon a showing of need, *if* the prosecutor makes "suitable arrangements by separation and copying, avoiding the incriminatory prejudice." *Id.* 124 U.S.App.D.C. at 321, 365 F.2d at 512. But *Barnes*, as well as *Harrington*,

proscribed the use of photos which "themselves . . . imply criminal conduct." *Id.* at 494–95. The rationale for this restriction is simple. The purpose of admitting photographs into evidence is confirmation of a previous identification, not proof of prior criminal record.[9] Accordingly, when allusion to a prior criminal record is a by-product of the proof of identification—as it was through the use of "mug shots" here—that allusion must be eliminated or the proof abandoned.

In summary, the need to prove the victim's pretrial identification of appellant Jones did not justify the admission of prejudicial "mug shots" into evidence. Their introduction constituted error.

D. The government has cited several cases which it claims cast doubt upon the continuing validity of *Barnes*—or at least upon the propriety of its application here. It is noteworthy, however, that in only one of these cases was the actual "mug shot" photograph introduced into evidence; and, in that case, the court found that the masking performed was adequate to avoid incriminatory impact. *United States v. DeSena*, 490 F.2d 692 (2d Cir. 1973). All the rest of these authorities are distinguishable from the two cases before us on the critical bases of prosecutorial need and/or type of proof involved.[10] Consequently, they do not affect the conclusions we have reached here.[11]

---

9. Proof of prior convictions is permissible only when a defendant takes the stand (subject to D.C.Code 1973, § 14–305), or otherwise places character in issue. *Michelson v. United States*, 335 U.S. 469, 475–77, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Evidence of still other crimes involving a defendant also may be admissible under certain, very limited circumstances, *e. g.*, to show motive or a common scheme. *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). Because "mug shots," taken alone, are neither evidence of a conviction nor proof of participation in another crime, it is questionable whether their use at trial, undisguised, could serve any valid purpose. In any event, the government did not seek to introduce convictions or other prior crimes evidence in this case.

10. *See Wilson v. United States*, D.C.App., 357 A.2d 861 (1976) (testimonial references to photographs); *Shuman v. United States*, D.C.App.,

243 A.2d 900 (1968) (testimonial references to police possession of photographs); *United States v. Jackson*, 166 U.S.App.D.C. 166, 509 F.2d 499 (1974) (testimonial references to photographs and alibi/mistaken identity defense); *United States v. Clemons*, 144 U.S.App.D.C. 235, 445 F.2d 711, *cert. denied*, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971) (prosecutor's reference to photo identification; identity in issue); *United States v. Lucas*, 143 U.S.App. D.C. 6, 442 F.2d 728 (1970) (testimonial reference to photographs); *United States v. Hallman, supra* (testimonial reference to ordinary snapshots; identity in issue).

11. *Barnes'* continuing validity was implicitly recognized in *United States v. Jackson, supra* 166 U.S.App.D.C. at 171, n. 35, 509 F.2d at 504, n. 35, when the court observed:

Despite our prior decision in *Barnes v. United States*, the government did ask that the

■ Next, the government posits a "waiver" excuse for introduction of the photos, maintaining that the defense's failure to take advantage of the prosecutor's offer to take any measure necessary to avoid or temper the prejudicial impact precludes complaint now. Counsel for Williams strenuously objected to admission of the "mug shots" *in any form*, even with "the entire bottom of the photographs" masked. The objection—the lack of waiver—was clear and unequivocal. The defense's failure to suggest and submit to a nonprejudicial mode of presentation cannot be interpreted as acquiescence in the slipshod disguise attempted. We cannot endorse the government's endeavor to shift to the defense the burden to prevent the prejudice from the government's own evidence.

■ The government maintains, finally, that if any error was committed it was harmless either because the court gave a curative instruction to the jury or because the prosecutor's cases against the appellants were so strong and the defenses so "incredible" that convictions would have resulted absent the error.[12] We do not agree.

■ First, it has been recognized that in the face of seriously prejudicial evidence, curative instructions, particularly those buried within the charge-in-chief at the end of trial, are of minimal worth. *United States v. Bussey*, 139 U.S.App.D.C. 268, 272–73, 432 F.2d 1330, 1334–35, (1970). In the present cases, the error was clear, the prejudice serious, and the curative instruction contained within the instructional litany at the close of trial. More important, because this evidence should never have gone before the jurors, there was no necessity to indulge in the questionable assumption that their awareness can be partially erased or that they actually can consider evidence only for a specific, narrowly defined purpose. Cautionary instructions, such as the one given in this case, are designed primarily to blunt permissible prejudice, *i. e.*, to prevent an inference of criminal record when photos are properly admitted for a valid purpose such as identification. They cannot cure impermissible prejudice. Counsel, as well as trial courts, ought not to ignore clear legal precedent, believing that all can be remedied by curative instructions; we do not wish to encourage such a trend of practice.

■ Second, the transcript reveals anything but overwhelming cases against Williams and Jones, let alone weak, incredible cases in their defense. Complainant's version of the incidents of March 26 was not without ambiguity and contradiction. She was the lone eyewitness, and very little corroborative evidence of violence during the encounter surfaced at trial. On the record, consent to relations with appellant Williams while appellant Jones was elsewhere was not a wholly unlikely possibility. The jury might well have been influenced because of the improper, indirect proof of appellants' criminal pasts.

In summary, the court's instruction did not serve to mitigate the serious prejudice from admission of the "mug shots"; and, on the basis of the record of the proceedings, we cannot confidently exclude the possibility that the errors—the impermissible insinuation of appellants' criminal backgrounds—held "substantial sway" in the jury's deliberations. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed.

---

photographs be let into evidence, but subsequently withdrew the request.

12. The government contends that appellant Jones' case must be measured against the "plain error" standard invoked when no objection is made at trial. While counsel for Mr. Jones did not object to the "mug shots" at trial, and "plain error" is the test ordinarily applied in such situations, *Lloyd v. United States*, D.C. App., 333 A.2d 387, 391 (1975); *Adams v. United States*, D.C.App., 302 A.2d 232, 234 (1973), we decline to utilize it in this case. The purpose of the "plain error" rule is not punitive. Rather, its functions are to permit trial courts fully to consider issues and thereby avoid potential error, and to afford prosecutors the opportunity to present evidence on the issue raised. *Adams, supra*. Since counsel for appellant Williams aired the appropriate objections, both purposes were fully served and would not be furthered by subjection of Jones' appeal to the "plain error" standard. Therefore, both cases will be tested against the same standard, harmless error.

1557 (1946). Consequently, we cannot deem the error harmless and must reverse the convictions of both appellants.

### III.

Appellants maintain that severance of their trials was necessitated by the "conflicting and irreconcilable" nature of their respective defenses. The government counters that the trial judge did not abuse his broad discretion because the different defenses of Williams and Jones were not sufficiently incompatible to require severance.[13]

The appellants were properly joined for trial under Super.Ct.Cr.R. 8(b), which provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Nevertheless, such properly joined defendants may request severance under Super.Ct. Cr.R. 14:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election of separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Prior to trial, appellant Williams moved for separate trials; the trial court denied the motion. Williams renewed the motion after complainant had testified and at the end of the government's case; again, it was denied. On each occasion, defense counsel informed the court of the conflicting defenses that served as the basis for the motion.

Our review of the refusal to sever is limited to a determination of whether the broad discretion entrusted to the trial court was abused. *Jackson v. United States,* D.C. App., 329 A.2d 782 (1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975). Furthermore, this court has held that in order to justify reversal, an apparent abuse of discretion must violate a defendant's right to due process and a fair trial. *Jackson v. United States, supra* ; *Smith v. United States,* D.C.App., 315 A.2d 163, *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

One recognized category of prejudice from joinder, which appellants suggest applies here, results when

> defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty. [*Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966).]

While this scenario is easily described, it is not easily applied, for nowhere does the case law specify the requisite quantum of conflict. The key lies in the necessity that the irreconcilability be of such a nature that the jury may conclude from the conflict alone that both defendants are guilty. This requirement contemplates a clear and substantial contradiction between the respective defenses.

Jones' and Williams' stories are not substantially contradictory. They both testified that they met briefly on the morning of March 26, and both presented defenses confirming that Jones did not enter Williams' house with complainant. The only conflict between their defenses was Williams' testimony that Jones also met Williams on the street in the afternoon, when complainant was present, whereas Jones presented a complete alibi, including denial of the alleged afternoon encounter. We conclude that this one conflict in their testimony does not suggest the degree of "dan-

---

13. The government maintains that Jones' failure to move for severance at trial triggers the "plain error" rule on appeal. Because Williams' counsel fully aired the severance issue, we again decline the invitation to apply different standards to the two cases. *See* note 12, *supra.*

ger of an unjustifiable inference of guilt" posited by *Rhone*.[14]

The predominant conflict between Williams and Jones did not develop from their respective defenses; it developed because complainant corroborated Williams' testimony about meeting Jones in the afternoon when she was present—and went further to identify Jones and say that he participated in the rape and robbery. Although the jury might have concluded that *both* appellants must have been lying if Jones was unwilling to concede this chance afternoon meeting with his friend, Williams, this conclusion would not have resulted from the defense conflict alone; it would have stemmed, rather, from consideration of that conflict in the bright light of other incriminating evidence—most importantly, the victim's ability to identify Jones.[15]

Although the trial court had the prerogative to grant the motion to sever, the defenses were not so irreconcilable as to create a substantial danger that the jury would infer guilt from that conflict alone. While we therefore reverse the convictions of appellants on the basis of prejudicial admission of "mug shot" photographs, we find no abuse of discretion in the trial court's repeated denials of the motion to sever.

*Reversed.*

---

**14.** From the conflict between Williams' testimony that he and complainant encountered Jones in the afternoon and Jones' testimony that no such meeting occurred and that he had never met complainant, jury logic might proceed as follows:

> Because complainant can identify stranger Jones, but he denies *ever* meeting her, he must have something more to hide than a casual encounter with Williams. Therefore, his alibi must be false, and he must be guilty. Also, if Jones refuses to concede even a ten-minute meeting with Williams in the afternoon, then Williams is probably lying about the incident, and probably about consent. Thus, he too must be guilty.

**15.** None of the cases cited reversed a trial court's failure to find sufficient conflict and irreconcilability. In fact, in *U. S. v. Hurt*, 155 U.S.App.D.C. 217, 476 F.2d 1164 (1973), the D.C. Circuit found an insufficient demonstration of prejudice when one defendant claimed total alibi and the other defendant testified that his co-defendant and the victim had "gone outside" by themselves. The court observed that since both defendants took the stand—as in the present case—the "conflict" was subject to scrutiny by mutual cross-examination. The court also found that the jury instruction to consider the evidence as to each defendant separately was helpful in preventing possible prejudice. Such an instruction was given in the present case.